## COURT OF APPEALS, NOV. TERM, 1801.

### BEALL *vs.* PRATHER.

A subsequent verbal agreement cannot confirm & renew a written contract after any lapse of time or change of circumstances, which may have taken place since its date.

Can the court of chancery decree upon an agreement appearing on the proof taken in the cause, upon which agreement the complainant does not claim relief, nor set it forth in his bill?

APPEAL from the Court of Chancery, decreeing a *specific performance* of an *agreement* to convey land. The bill, which was filed on the 25th of February 1798, states, that *Beall*, the defendant in the court below, (the present appellant,) being seised of a tract of land called *Godfather's Gift*, containing, by the representation of the said *Beall*, 140 acres, contracted to sell, and did actually sell the same to the complainant, *(Prather,)* on the 31st of August 1782, who paid him one dollar as earnest money, and *Beall*, on the same day, executed a bond of conveyance under

his hand and seal, thereby agreeing to convey to *Prather* the said tract of land. That *Prather* was to give *Beall* £600 for the land; and on the 1st of August 1782, he gave his bond to *Beall*, thereby binding himself to pay the said £600; one half thereof at Christmas day next succeeding, and the remainder at some subsequent period. That some short time before the execution of the bond of conveyance, *Beall* sold to one *Lucas* about 27 acres of the said land, of which he did not give *Prather* notice. That *Prather*, discovering the said 27 acres had been sold, *Beall* proposed to make a deduction for the same out of the first payment, and to that effect wrote *Prather* a letter, dated 20th January 1783, signed "*James Beall.*" This letter stated the quantity sold to be only 24 acres. That in consequence of the said letter, *Prather* went to *Beall* to settle and adjust the business, but that *Beall* refused to perform his engagement in that respect. That *Prather* then made an actual tender of the first payment, being £300 in specie, but *Beall* refused to receive the same. That *Prather* is now ready to pay, &c. That *Prather* had, at the request of *Beall*, paid him several small sums of money in part payment of the said land, as by an account filed. That *Beall* has always remained in possession of the land, and received the profits, &c. and has always refused to convey the same to *Prather*, or any part thereof. That he *Prather*, hath always been, and still is willing to comply with his contract, by payment of the purchase money, but claims a deduction for the land sold to *Lucas*. *Prayer* for a conveyance of the land, and for an account of the profits, and the sales of the timber.

The *answer* of *Beall* states, that he called at the time mentioned in the bill at the house of the complainant, and there got intoxicated; that during his intoxication, he supposes, he might have agreed to sell the land stated in the bill, but he does not know that he did, neither does he admit the paper exhibited, [*the bond of conveyance.*] to be his act and deed. The said paper, on inspection, having

Nov. 1801.

Beall
vs
Prather

evident marks of fraud and imposition, for he says that he can write legibly, and to all contracts by him made he always signs his name fairly, and at length, without being obliged to make his mark only. That no part of the consideration was ever paid to him as *earnest,* to his knowledge or belief. That the complainant well knew, at the time of the supposed contract, that he *Beall,* had no right to the land claimed by *Lucas,* and that *Lucas* had purchased it long before of the defendant's brother, and not of the defendant. That on his return home, after getting sober, he was informed that he had been drawn into a contract for the sale of his land to *Prather,* he however concluded, notwithstanding the gross imposition and fraud which had been practised upon him in his moments of intoxication. to let the complainant have the said land, *provided he complied in making the payments agreeably to contract.* That by the bond exhibited, executed by the complainant, he was to pay the defendant £300 on the Christmas following, and the residue, with interest, at any future day. That after waiting about two years. the defendant went to the complainant's house, and offered to him, and did actually tender, a deed for the said land, provided the complainant would pay him the consideration money, which the complainant refused to do. That the complainant never did tender to him £300 as alleged; neither did he the defendant ever receive one farthing from the complainant as part consideration for the said land. He does not recollect signing the letter exhibited, fifteen years and upwards having elapsed since the date of it. That he has constantly been in the uninterrupted possession of the land, and no steps have ever been taken by *Prather* to comply with his supposed contract. That owing to the Federal city being within 10 miles of the land, it has greatly increased in value, and that is the sole cause why the complainant wishes to set up and establish a claim to the same, after letting it remain dormant and unfulfilled on his part for upwards of sixteen years. He relies on this long lapse of time,

and the complainant's nonperformance of his part of the said supposed contract, together with the circumstances of fraud and imposition manifestly apparent in the conduct of the complainant, as a sufficient justification for not conveying the said land to the complainant, which the defendant does not wish to do, he not being obligated, upon any principle of equity or justice, to a specific performance of the said supposed contract at this distance of time, since the alleged execution thereof. Prays to be dismissed, &c.

*Testimony* taken, &c. which appears to be correctly stated in the decree and arguments of counsel.

HANSON, Chancellor. The facts appearing from the proofs in the cause are as follow: In the year 1783, *James Beall*, a man much addicted to drink, but at that time sober, contracted with *Nathan Prather* to sell, and with a general warranty to convey to him, a tract of land called *Godfather's Gift*, for the sum of £600; some time after the contract, *Beall* sent *Prather* a letter, offering to make a deduction on account of 24 acres, which he had before conveyed to another person; but has never manifested an intention of performing his agreement; neither party has at any time done what ought to have been done, by a man meaning to carry his contract fairly into execution; a sham tender of money indeed is made by one, and an improper deed is tendered by the other; and then at least ten years elapse without any thing done, or offered to be done by either; although it does not appear that *Prather* relinquished his bargain, or that *Beall* had reason to believe he would give it up. After this lapse of time, they come to a *verbal agreement* that *Prather* pay the money, according to contract, and that *Beall* at the Christmas following, viz. Dec. 25th 1785, deliver possession, provided that if he could not provide himself a place, his stock and father should remain on the land. In making this parol agreement, it seems that *Prather* gave up his claim to a deduction on account of the 24 (or as he says 27,) acres, conveyed to another person, and on account of the small payments made in 1783.

Although little has been said of this parol agree-ment, and it is not stated in the bill, the chancellor conceives it of great importance. It removes the objection of lapse of time, dormant contract, and imposition in obtaining the written contract, and may be also considered as settling all questions respecting the interest of the purchase money on one side, or waste, and profits on the other side.

The chancellor does not recollect any decision expressly in point, but inasmuch as it is clear from the books, that the parties to a written contract may rescind or dissolve it by a subsequent verbal agreement, he cannot doubt the propriety of considering a subsequent verbal agreement as confirming or even renewing a written contract, notwithstanding any lapse of time, or change of circumstances, which may have taken place since its date. The only doubt that the chancellor can entertain is, whether or not the subsequent parol agreement ought not to have been made a part of the case, and have been stated in the bill. However, as the evidence respecting it has not been objected to, and as without being considered as a part of the case, it certainly tends to establish the pretensions of the complainant, and places things on a fair footing between the parties, the chancellor does not hesitate to make it the foundation of his decision.

Under all the circumstances therefore of the case— *Decreed*, that in case the complainant shall, on or before the 15th day of January next, bring into this court, to be paid to the defendant, or shall pay to the said defendant, the sum of £600, the said defendant shall thereupon, by a good deed to be acknowledged and recorded agreeably to law, give, grant, bargain and sell, to the complainant, and his heirs, the tract of land in the bill mentioned, called *Godfather's Gift*, and all the right, title, interest and estate therein, of the said defendant. But in case the said complainant shall not bring in the said money to be paid, or pay it as aforesaid, on or before the said 15th day of January next, the contract in the bill stated, shall and

it is hereby declared to be null and void. Provided that the complainant be at liberty notwithstanding, to pursue his remedy, (if any he shall have,) at law, against the defendant, for the nonperformance of the condition of his bond passed for conveyance of the aforesaid land.—It is farther decreed, that each of the parties bear his own costs. From which decree the defendant appealed to this court.

*Martin,* (Attorney General,) and *Ridgely,* for Appellant.

*Key* and *Shaaff,* for the Appellee.

*Ridgely,* for the Appellant. It it should appear to this court by proof, that the alleged agreement was fairly entered into between the parties, and was the result of *serious* and *deliberate* consent, without which no contract can be conscientiously enforced, and *specifically* decreed in a court of equity; that since its being entered into, there hath been no default in the complainant in performing all that was to be done on his part; and that it is both *just* and *right* for this court to decree a specific performance; if all these circumstances appear to the satisfaction of the court, then a decree for the specific performance of this contract should be passed. But if, on the contrary, it shall appear that this agreement was collusively and fraudulently obtained from the defendant, at a time when he must have been intoxicated to such a degree as to have lost his reason, and was therefore incapable of making any *serious* or *deliberate* engagement for the disposition of his property, and that he was drawn into this situation by the contrivance of the complainant; that the land, at the time of this contract, was worth more than the price agreed for— that the complainant, although called upon by the defendant, hath neglected and refused to comply with his part of this agreement—that circumstances have altered, and the value of property greatly increased since this supposed contract was entered into.—If all these things appear, and they will, upon an attentive perusal of the exhibits and proofs, then the court

will determine either to annul and set aside the agreements between the parties, or at least reverse the decree, dismiss the bill of complaint, and leave the complainant to his remedy at law. It is not denied but that a court of chancery is the proper tribunal to which application should be made for a specific performance of an agreement respecting lands. But it is contended that an agreement, which a court of equity will enforce in specie, must be obtained with all imaginable fairness, and without collusion or imposition. Let us now see how far this contract is proved, and what circumstances appear to have taken place when it was obtained. For in investigating the rectitude of any transaction, the reputation and character of the parties concerned ought to have a considerable influence in forming a proper judgment. The exhibit, which is stated to be the bond signed by the defendant, upon bare inspection must appear to every one to have been executed by the defendant, if it ever was executed by him, when he had lost, not only his rational faculties, but also the use of his members; for no one can possibly understand the signature; it is totally unintelligible, and might as well be called the signature of A or B, as that of *James Beall,* the defendant. And is it reasonable to suppose, when a man was about parting with his house and home, that he would have thus signed a paper as evidence of his engagement? For a number of witnesses have proved, that the defendant wrote a legible hand, always signed his name when he sent orders to stores, and that a paper exhibited is of his hand writing. But there are other circumstances, independent of the want of signature of this bond, which must carry conviction to every man's mind, that there must have been a concealed scheme between the complainant, his family, and the subscribing witnesses to this bond, to entice the defendant to the complainant's house, get him drunk, and then obtain this contract. In the first place, if we attend to the evidence, we shall find that there is not a single witness who has been examined by either

the complainant or the defendant, but expressly declares that the defendant is much addicted to liquor, and when intoxicated is totally unfit for any kind of business; and will any person who looks at this paper pronounce that the defendant was sober when it was executed? But let us attend to other parts of the testimony, and see whether this conjecture is not well founded. It is proved that the writer of the bond, and one of the subscribing witnesses, were men of bad character; all of the witnesses speak slightly of the other subscribing witness, while some of them expressly swear he bore a bad character also. That the complainant was a tricky man, and would take advantages. That the writer of the bond, and one of the subscribing witnesses, went to the defendant's house, and from thence, in his company, went to the complainant's house, when the bond was executed. When all these circumstances are weighed; when it is considered that the defendant is a poor drunken creature; that the two witnesses, and the complainant himself, are all persons of bad fame, no doubt can exist in any one's mind, but that this contract was unfair, unduly obtained, and ought not for that reason, independent of other considerations, to be enforced. But waiving all these circumstances, for the sake of argument let us suppose that the contract, when originally entered into, was founded on deliberation; that it was *fair* and *conscientious* between the parties, being entered into on an *adequate consideration*, and therefore ought to *meet the aid* of this court. Yet, does not the subsequent conduct of the complainant since the year 1782, as established by the proofs in the cause, afford sufficient reasons for this court to reverse the decree of the chancellor, and refuse its aid to carry this contract into effect? It is a rule in equity, (and a very equitable and just rule it is,) that he who demands the specific execution of an agreement ought to shew that he has been in no default in performing all that was to be done on his part. For where a man has trifled or shewn a backwardness in performing his part of the contract,

Nov. 1801.

Beall
vs.
Prather

equity will not decree a specific performance. 1 *Fonb.* 384, 385. *Gilb. on Eq.* 43. Let us now see the conduct of the complainant, and whether he has performed all that he was to do, or whether he has not trifled with the defendant, and evinced a reluctance to comply with his part of this contract—nay, whether the complainant's conduct was not such, about 12 years ago, as amounted to an absolute refusal on his part to fulfil this contract. What are the facts? Mutual bonds are entered into in August 1782, for the conveyance of the land by the defendant, and for the payment of £600, with interest, one half of it on a specified day, by the complainant. In December 1783, (one year after the first payment was due on the complainant's bond,) a sham tender was made of £300, but had the defendant been disposed to receive it, the person who made the tender was not to have paid. Here then we have an instance of the *trifling conduct* of the complainant, who being either unwilling or unable to perform his part of the contract by paying the money, prevails upon the witness to make an *ostensible tender*—but still he was not to part with the money. Can this be considered in a court of conscience, where all transactions, to merit countenance and support, should appear upright and sincere, as evidence of the part of the complainant of his intention to act uprightly? It certainly cannot. For he who comes into a court of equity to *demand equity*, must come with pure hands, and sincere intentions to fulfil his engagements. He must do *equity*, before he can require *equity* of this court. How then has the complainant fulfilled his part of this contract? Has he done it by this sham and ostensible loan? Does he come openly and without design, before this court, and has he demonstrated by proof, that the money contracted to be paid was ready for the defendant; or has he not shewn that the money was not ready? That this tender was a mere evasion, a trick, to give countenance to this present suit. But what did the defendant say? That he would not receive it, as it was not paid according to contract; but that if the whole money had been offered, he would have received it.

Let us now attend to what follows in the further investigation of this case. We find that the defendant, some years after the date of the contract, called on the complainant, tendered him a deed, and demanded the money. The complainant paid no money, but replied that the rent would pay for the land in dispute; and this appears to have been his impression, from his repeated declarations to that effect from the evidence, and from the prayer of the bill filed, which claims rents and profits. After the complainant's refusal to pay to the defendant the purchase money due for this land, when applied to several years after the contract was entered into, how can he come into a court of equity and pray its aid for the completion of an agreement which he was the first to violate? Was the defendant always to be kept bound to fulfil this contract, and the complainant left at full liberty to pay the purchase money when he pleased? Was not the situation of the defendant to be considered also? Are we not to suppose, that when he sold his house and home, that he had occasion and use for the purchase money? Is not his disappointment to be considered? Does not the obligation on the part of the defendant to convey his land cease the moment the tender of the deed was made by him and there was a refusal to pay the money on the part of the complainant? But it has been contended, that the complainant and defendant confirmed this contract in the spring of 1797. How has this pretended new agreement been complied with on the part of the complainant? The evidence as stated, shews that the complainant left the defendant in total uncertainty till the filing of the bill in February 1798—no money paid or tendered.

There is another circumstance attending this case, which alone, and independent of *all other considerations*, should induce this court to reverse the chancellor's decree. The *inadequacy of price* for the land, and the *increase in value* of the property occasioned by *alteration of circumstances* since the year 1792. We readily admit, that inadequacy of price alone is not a sufficient ground to annul a contract. But inasmuch

as a court of equity hath a *discretionary* power to carry a contract into execution or not, whenever it appears to such court that the original price was *inadequate*, and that *alteration of circumstances* hath increased the value of the property from 50 to 100 per cent. it may safely, and justly too, *use its discretion*, and *refuse its aid to carry the agreement into effect*, and leave the party to his remedy at law. The evidence is full that the establishment of the seat of government at the city of Washington has increased the land nearly double in value since 1793. A court of equity will not decree a specific execution of articles where they appear to be *unreasonable* or *founded* on a fraud. *Finch*, 538. *Preced. in Cha.* A court of chancery is not bound to assist contracts which were harsh and unequitable, or were attended with such circumstances as would be a hardship on the defendant. It is a case proper for a jury at law to consider of, where damages might be mitigated according to circumstances. *Finch*, 575. In *Talb. Eq. Cases*, 236, an agreement was obtained from a person who had several strokes of the palsy, which had greatly *impaired* his understanding. Two questions arose—1st. Whether the articles were such as a court of chancery would set aside? 2d. And if not, whether the court would decree a specific performance of them? The lord chancellor said, the court of chancery, in cases of articles, had a discretionary power to carry them into execution or not; and if it appeared that they were unfairly obtained, though not to such a degree as to set them aside, yet the court would not order a performance, but leave the plaintiff to his remedy at law. A court of equity hath always refused its aid to stale demands, where the party has slept upon his right, and acquiesced for a great length of time. Nothing can call this court into activity but conscience, good faith, and reasonable diligence—Where these are wanting, the court is passive and does nothing. 3 *Bro. Cha.* 640. A decree was reversed, because the party who insisted on a specific performance had not complied with his part of the contract, by making out

deeds by a particular day. 2 *Bro. Parl. Ca.* 396. A court of equity is not bound to decree a specific execution of articles which appear *unreasonable* or *founded on a fraud,* or where it would be *unjust* or *unconscionable* to assist them. 2 *Eq. Ab.* 18, *pl.* 7. He who demands the execution of an agreement, ought to shew that he has been in no default in performing all that was to be done on his part; for if he will not, or through negligence cannot perform his part of the contract, he has no title in equity to the performance of the other party. Where a man has trifled or shewn a backwardness in performing his part of the contract, equity will not decree a specific performance, especially if circumstances are altered. If a man sells lands, and will not make a title, he shall lose the bargain, for the party ought not to be perpetually bound without having a performance. 1 *Fonb.* 384, 385. *Gilb. on Eq.* 43. Security being gotten from the defendant when drunk, the lord chancellor would not give the plaintiff any relief in equity. 1 *Ch. Ca.* 202. Equity will relieve in case of drunkenness, which is a kind of insanity for the time, especially if it were caused by the fraud or contrivance of the other party, and he be so drunk as to be deprived of the use of reason or understanding. A man consenting to a contract at that time cannot be considered as giving it a *serious and deliberate* consent, and without this no contract can be binding by the law of nature. 1 *Fonb.* 384, 385. *Gilb. on Eq.* 43. 1 *Ves.* 19. 1 *Pow. on Cont.* 29, 30. Time is very material; a bill dismissed, because the title was not laid before counsel by a particular day. 21 *Vin.* 541. Every agreement ought to be *certain, fair* and *just,* in all its parts; if any of these ingredients are wanting, this court will not decree a specific performance. 3 *Atk.* 386. Articles, out of which an equity could be raised for a decree in *specie,* ought to be obtained with all imaginable fairness, and without surprise or circumvention. 1 *Vern.* 229. The court had greater latitude, because the time had elapsed which was fixed by the articles to pay the money in. 2 *Vern.* 136. 2 *Pow. on Cont.* 273.

But we shall find that the complainant is not only desirous of getting the land from the defendant according to the contract, but wishes an abatement for 27 acres sold by the defendant so long ago as the year 1774. This attempt of the complainant is all of a piece with the rest of his conduct. For if we look at the original bond, we find no quantity of acres specified—neither doth it appear that the land was sold by the acre. Besides, we find at the very time this agreement took place, these 27 acres were in possession of *Lucas's* tenant, and actually enclosed, and had been so for years, and that the complainant resided within two miles of the place. It also appears by the proof in the cause, that the defendant had parted with this parcel of the land in the year 1774. How then can even a shadow of doubt arise that the complainant has been imposed on by the defendant?

*Shaaff*, for the appellee. The bill in the case was filed 25th February 1798, for a specific performance of a contract to convey part of a tract of land called *Godfather's Gift*. It is first necessary to prove the bond of conveyance. For this purpose the endorsement, signed by the counsel, and the actual proof by *John Prather* of the execution, is fully sufficient. The bond being proved, the relief can only be opposed on one of the three grounds which are stated in the answer. 1st. *Fraud.* 2d. *That the contract has laid dormant;* and 3d. *That the complainant has not complied with his part of it.*

1st. *Fraud.* On this ground no evidence is given of any *actual fraud;* none is stated in the answer. But the contract is proved to have been made fairly, and when the defendant was sober. Drunkenness is not alone sufficient to set aside a contract. 1 *Pow.* 29. 3 *P. Wms.* 131 *(n. A.)* 1 *Ves.* 30. It is certainly acknowledged and confirmed by the letter of January 1783. This letter is proved, first by a comparison of hands with the defendant's exhibit; and secondly, by the person who delivered it, who says it

came from the defendant. If a contract is obtained Nov. 1801
improperly, and afterwards freely acknowledged, it
will be supported.  3 *P. Wms.* 294. *(n. B.)* 2 *pt.* 1 Beall
vs
Pratheri
*Eq. Ca. Ab.* 58. *(n. a.)*

2d. *The contract has laid dormant,* &c.  It must be
admitted, that limitations do not *bar* a court of equi-
ty; but they refuse relief to a stale claim, or that
they have a discretion, &c. and use it for that pur-
pose. on a presumption of a release, &c.  1 *Fonb.*
320. 5 *Vin.* 534, *pt.* 8. 1 *Eq.* 26. 2 *Vern.* 127. These
cases however, only establish the principle that dor-
mant claims are not to be favoured.  In this case
there was a constant claim and dispute.  *First*—The
tender of the money.  *Second*—the letter of January
1783.  *Third*—the tender of the deed by the com-
plainant in 1787; and *fourth*—the acknowledgment in
1797.  These are sufficient to take it out of the act
of limitations, and being a trust, it cannot be barred.
The dormancy of a claim may be explained by cir-
cumstances, and the circumstance here was the con-
test about the 27 acres.  1 *Fonb.* 322. 384 *(n. e.)*

3d. *That the complainant has not complied,* &c. For
this purpose, 1 *Fonb.* 384, has been cited.  But it is
not alone sufficient to prevent the relief that the con-
tract is not strictly complied with. 1 *Atk.* 12. 2 *Pow.
on Cont.* 272. 2 *Ves.* 450. 1 *Fonb.* 384. In this
case inadequacy of price can be no objection, since it
is not alleged in the answer, but that the price was
adequate at the time.  No subsequent change of cir-
cumstances will alter the case.  2 *Pow. on Cont.* 232.
1 *Eq. Ab.* 26.

THE COURT OF APPEALS, [*Mackall, Jones, Potts*
and *Dennis,* Judges, *(a),*] at this term, *reversed* the
decree of the court of chancery, with costs to the
appellant—and decreed, that the chancellor dismiss
the bill of complaint, and that each party pay his
own costs incurred in the court of chancery.  Pro-
vided that the appellee be at liberty, notwithstanding,
to pursue his remedy at law, (if any he shall have,)

*(a) Rumsey,* Ch. J. did not attend.

Nov. 1801

Beall
vs
Prather

against the appellant, for the nonperformance of the condition of his bond, passed for the conveyance of the aforesaid land. That the court of chancery shall give the necessary and proper directions for carrying this decree into execution.